In re ESTATE OF D.W. (Margaret Jolivet, Guardian *ad Litem, et al.*, Petitioners-Appellants, v. Thomas S. Chuhak, Guardian *ad Litem*, Respondent-Appellee).

First District (2nd Division)   No. 85—2110

Opinion filed July 31, 1985.

Roger Baldwin Foundation of ACLU, Inc., of Chicago (Harvey Grossman, Colleen K. Connell, Benjamin S. Wolf, Ann M. Kuta, and Jonathan K. Baum, of counsel), for appellant Margaret Jolivet, temporary guardian *ad litem*.

J. Stirling Morton, Ltd., of Dolton (Jean A. Adams, of counsel), guardian *ad litem*.

Chuhak, Kienlen & Feinberg, of Chicago (Thomas S. Chuhak, of counsel), appellee and guardian *ad litem* for unborn fetus.

PER CURIAM: This expedited appeal concerns a trial court's order denying the appointed guardian authority to consent to an abortion for her ward, a pregnant, severely mentally retarded 18-year-old girl. We reverse.

D.W. is a severely mentally retarded 18-year-old girl possessing the cognitive and adaptive abilities of a 5-year-old child. D.W.'s mother, the petitioner-appellant herein, filed this action on July 8, 1985, after discovering that D.W. was pregnant. Pursuant to section 11a—1 *et seq.* of the Probate Act of 1975 (Ill. Rev. Stat. 1983, ch. 110½, par. 11a—1 *et seq.*), petitioner requested a court order appointing her temporary guardian to authorize and approve any appropriate medical procedures concerning her child's pregnancy, including an abortion.

A hearing was held on July 15, 1985. Three witnesses testified on petitioner's behalf, and they were the only witnesses to testify. Their testimony is uncontroverted.

Dr. Jerry L. Warren, a psychologist who had worked with D.W. over the past several years, testified that D.W. would be completely unable to understand the dynamics of being pregnant, including the importance of diet, exercise, and the need to take physical precautions in order to avoid injuring herself or the fetus. Warren stated that the tendency of people possessing D.W.'s mental disability is to be volatile and vulnerable to stress, and that carrying the child to term would likely be very traumatic for D.W. The pregnancy would pose the risk of damage to D.W.'s emotional health. Warren also testified that D.W. would be unable to understand any of the baby's needs. Warren observed that if a stranger asked to take the baby from D.W., she would probably cooperate because she is extremely susceptible to suggestion. In his opinion, D.W. lacked sufficient capacity to make or communicate responsible decisions concerning her condition, and she would not be capable of caring for a child.

Dr. Marvin Rosner, an obstetrician and gynecologist, testified that based upon an ultrasound test performed the morning of the hearing, he concluded that D.W. was between 12 and 13 weeks pregnant and that the fetus was not viable (able to survive outside the uterus). Rosner highlighted the various dangers facing D.W. if she carried the pregnancy to full term. Rosner stated that the delivery itself would pose serious risks. He testified that because of D.W.'s mental disability, a normal delivery would create a very dangerous situation for her. D.W.'s condition would necessitate a general anesthetic and an elective caesarean section. A caesarean section has a mortality risk three to four times that of normal delivery and poses various other difficulties, including blood clots and infection. Rosner contrasted that risk with the fact that abortion procedures then available were seven times safer than full-term delivery for a normal woman. In his professional judgment, Rosner stated that terminating the pregnancy would be best for D.W. Rosner admitted that he had never examined D.W.

Finally, D.W.'s mother testified that she provides all of D.W.'s basic care. D.W.'s mother testified that D.W. cannot take care of herself. Neither the guardian *ad litem* appointed to represent D.W., nor the guardian *ad litem* appointed by the court to represent the fetus, presented evidence to controvert the testimony of the three witnesses.

On July 16, 1985, after hearing the evidence and arguments of counsel, the court found D.W. incompetent and appointed her mother temporary guardian to make those medical decisions necessitated by the ward's pregnancy. However, based on the testimony presented, the trial court concluded that no evidence was presented to show that

an abortion was necessary to protect the health or life of D.W. Consequently, the court's order provided:

> "The temporary guardian is not authorized to approve an abortion for the ward because there was no evidence that an abortion is necessary for protecting the life or health of the ward."

■ The trial court based its order on section 11a—17 of the Probate Act of 1975, which provides in relevant part: *"To the extent ordered by the court and under the direction of the court,* the guardian of the person shall *** procure for [the ward] and shall make provision for [the ward's] support, care, comfort, health, education and maintenance and such professional services as are appropriate ***."* (Ill. Rev. Stat. 1983, ch. 110½, par. 11a—17(a).) (Emphasis added.) We believe that the trial court interpreted section 11a—17 in a manner that unduly limits an appointed guardian's exercise of judgment on behalf of a ward.

■ In our view, section 11a—17 of the Probate Act of 1975 vests a guardian with broad authority to act in the best interest of the ward. The court's duty in this regard is to ensure that the acts and decisions of the guardian reflect the best interest of the ward by judicially interfering if the guardian is about to do some act that would cause harm or threaten harm to the ward. Here, we cannot presume that D.W.'s mother was not acting in D.W.'s best interest when she petitioned the court for authority to consent to an abortion for D.W. At the hearing, there was no evidence suggesting that the mother was not acting in D.W.'s best interest. Plainly, there is no legal requirement that a medical necessity exist before a guardian can consent to an abortion for a ward.

■ Under the circumstances, the trial court erred in concluding that there had to be a medical necessity for the abortion in order to give the guardian authority to consent to an abortion for D.W. Absent any proof that the guardian was not acting in the best interest of D.W., the trial court had no legal basis for denying the guardian's request for authority to consent to an abortion for D.W.

Accordingly, the order of the trial court is reversed, and an order is entered allowing the guardian to consent to the ward having an abortion.

Reversed.

STAMOS, P.J., and PERLIN and RIZZI, JJ., concur.